Aarol W. Irish and Elaine M. Irish v. Commissioner.
Irish v. Commissioner
Docket No. 1585-67.
United States Tax Court
T.C. Memo 1969-45; 1969 Tax Ct. Memo LEXIS 250; 28 T.C.M. (CCH) 252; T.C.M. (RIA) 69045; March 10, 1969, Filed Michael J. Mehr and Basil M. Briggs, 3000 Guardian Bldg., Detroit,Mich., for the petitioners. Ralph F. Keister, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: The Commissioner determined deficiencies in petitioners' income tax for the calendar years and in the amounts as follows: Year
Amount
1962
$ 211.14
1963
6,781.72
The principal issue presented for our determination is whether petitioner purchased four houses with the intent to demolish them, so as to be foreclosed from taking a loss deduction under section 165 of the Internal Revenue Code of 1954. [1] If not, has petitioner adequately established the adjusted bases of these houses at the time of their demolition and removal? *251 Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided at Saginaw, Michigan, both at the filing of the petition and at the time of trial. They filed a joint Federal income tax return for each of the calendar years 1961, 1962, and 1963 with the district director of internal revenue at Detroit, Michigan. They also filed timely refund claims and amended Federal income tax returns for the years 1962 and 1963 with the district director of internal revenue at Detroit, Michigan. Inasmuch as Elaine M. Irish is joined here only by virtue of the joint returns filed with her husband for 1962 and 1963, the term "petitioner" will hereinafter be used to designate Aarol W. Irish. Petitioner, whose offices are in Saginaw, Michigan, has been a general agent of the Union Mutual Life Insurance Company of Portland, Maine, since 1950. As a result of an insurance course which petitioner attended, he developed an interest in purchasing rental properties for the future security and education of his children. Petitioner's family had seven children in 1961, eight in 1962, and nine in 1963. At a later date and sometime prior to April 7, 1961, petitioner *252 was contacted by a social acquaintance who owned two houses located at 1600 and 1606 N. Michigan Avenue, Saginaw, Michigan (hereinafter 1600 and 1606), for the purpose of inducing petitioner's purchase of the homes. On the condition that petitioner would purchase both homes, he was given the option on April 7, 1961, to purchase 1600 for $16,000 and 1606 for $14,000. The option was exercised by petitioner on May 20, 1961. In order to purchase those properties, petitioner borrowed approximately $26,000 from his business partner, petitioner supplying the balance of the purchase money from his own funds. Then, on June 28, 1961, and August 11, 1961, petitioner acquired options to purchase two other houses located at 1612 and 1618 N. Michigan Avenue (hereinafter 1612 and 1618). [2] The option on 1612 was exercised on August 29, 1961, and the option on 1618 was exercised on August 15, 1961. The purchase of the real estate located at 1612 and 1618 was closed on October 10, 1961, petitioner paying $16,113.87 for 1612 and $15,052.85 for 253 1618. [3] Petitioner purchased 1612 and 1618 by placing a single consolidated bank mortgage in the approximate amount of $56,000 on all four parcels of *253 real estate. Prior to the acquisition of the four houses in question, petitioner had very little real estate experience. The houses acquired by petitioner were in a generally residential neighborhood, although the particular block on which petitioner's houses were located was bounded on the west by N. Michigan Avenue, on the east by the tracks of the New York Central Railroad, to the north by the Sunshine Biscuit Company, and to the south by Draper Chevrolet Company (hereinafter Draper), a Chevrolet dealership. St. Luke's Hospital was diagonally across N. Michigan Avenue. At the time of acquisition, as well as at the time of trial, the properties immediately adjacent to 1600-1618, both to the north *254 and south as well as directly across N. Michigan Avenue, consisted of residential housing. Inasmuch as the four houses were in various states of disrepair immediately prior to the time petitioner acquired them, petitioner, in order to obtain funds necessary to complete the purchase of 1612 and 1618, made certain repairs so as to induce the bank to appraise the properties at higher values than it might otherwise have done. Prior to October 10, 1961, petitioner expended the following amounts for repairs: Item
Date paid
Amount
Tree service
7/ 1/61
$ 41.00
Plumbing
8/31/61
6.00
Materials
8/29/61
13.40
Painting
8/31/61
130.00
Tree service
9/15/61
275.00
Painting
9/29/61
255.00
Painting
9/29/61 445.00 $1,165.40 Subsequent to October 10, 1961, and to the time of demolition and removal of the houses, petitioner expended the following additional amounts for repairs. [4]
Item
Date paid
Amount
Plumbing
11/21/61
$ 32.81
General repairs
6/28/62
6.50
Painting
12/ 6/62
115.00
$154.31 In addition to the foregoing out-of-pocket expenditures, petitioner, his wife, and children contributed their own labor in order *255 to improve the general condition of the vacant houses in anticipation of new tenants. At the time petitioner purchased the four houses he was familiar with all of them and was aware of the rental income generated by 1600, 1606, and 1612, all of which were occupied by tenants at the time of purchase. The tenants in 1600 paid $135 a month and the two families in 1606 paid a combined monthly rental of $152.50. Although 1618 was vacant at the time of purchase, it was petitioner's feeling that this was the best preserved of the four houses and could be easily rented. Petitioner also considered using 1618 as an office for his insurance agency. On May 23, 1961, petitioner purchased a casualty and business interruption insurance policy with a 5-year term on 1600 and 1606, which provided the following amounts of coverage: Loss of
Dwelling
Casualty
rental income
1600
$12,000
$1,170
1606
12,000
1,420 On October 17, 1961, petitioner purchased a casualty insurance *256 policy with a 5-year term on 1612 and 1618 with coverage in the respective amounts of $10,000 and $16,000. The tenants occupying 1600 through 1612 vacated at various times between September 1961 and June 1962. [5] On August 29, and November 2, 1961, petitioner responded to advertisements in a local newspaper which had inquired about homes for rent. During November 1961, petitioner advertised in a local paper for the rental of 1612. On February 9, 1962, petitioner advertised in a local paper for the rental of 1606 and 1618, indicating their availability as of February 15, 1962. [6] The following amounts were expended by petitioner in advertising the four houses for rent: Year
Amount
1961
$ 6.26
1962
22.08
1963 254 In addition to the newspaper advertisements, petitioner personally attempted to rent the vacant houses to numerous people, including his bookkeeper and an out-of-town employee of his insurance company who was staying in Saginaw for an indeterminate period. Aside from the income derived from the renting of 1618 to the out-of-town insurance employee for $25 a week for a short period, petitioner was unable to find new tenants for any of the properties *257 as they became vacant. By the late summer of 1962, petitioner was faced with the increasingly heavy financial burden of meeting mortgage payments, real estate taxes, utility bills, and maintenance costs on the four vacant houses. In an attempt to reduce these costs, and upon the advice of a real estate agent, petitioner began making plans for the removal of the houses. On September 1, 1962, the house at 1612 was sold to Robert Bierlein (hereinafter Bierlein) for $800, which money was used to make 3-months' mortgage payments. The house at 1612 was physically removed from the real estate by Bierlein in 1962 at no cost to petitioner. On October 26, 1962, Bierlein agreed to demolish the houses at 1600 and 1606 at no cost to petitioner, provided Bierlein could do the work at his convenience. Pursuant to that agreement, the demolition of those two houses was not completed until February 1963. Petitioner did not demolish *258 the house at 1618 at that time since he still thought he might use it as an office for his insurance agency. Demolition of 1618 was eventually started in April 1963 and completed the following month. As a result of the removal of the four houses which was done with the permission of the mortgagee, Michigan National Bank, the assessed valuation of the properties was reduced. The adjusted bases of the houses at the time of demolition or removal, as reported on petitioner's Federal income tax returns, were as follows: Address
Adjusted basis
1600
$10,247.73
1606
8,395.95
1612
10,793.37
1618
5,099.75
At the time of demolition and removal of the four houses, petitioner's bookkeeper, who had been retained to keep records of the properties in question, reflected the demolition of the houses in petitioner's books by adding the adjusted basis of each house to the cost of the land. Petitioner's bookkeeper was not an accountant, had never previously made bookkeeping entries reflecting demolition of buildings, was unfamiliar with the Federal tax law relating to the treatment of demolition losses, failed to research the point before making the entry, and consulted *259 neither petitioner nor his accountant prior to making the entry. When the entry came to the knowledge of petitioner's accountant, who had the responsibility of preparing petitioner's Federal income tax returns prior to and during the years in question, he informed the bookkeeper that his entry was erroneous. The accountant did not know of the sale and removal of 1612 and the demolition of 1618 at the time he prepared petitioner's Federal income tax returns for the years in question. Immediately upon learning such facts, the accountant filed refund claims for petitioner in order to reflect the losses he felt petitioner had incurred. The following is a schedule of the rental income and expenses reported by petitioner on his Federal income tax returns for 1961, 1962, and 1963 with respect to the houses in question: 255 *11
1961
1962
1963
Income before expenses
$2,614.33
$1,370.00
$0
Expenses
Repairs
Carpentry and maintenance
$ 833.71
$ 121.50
Maintenance
Cleaning (yard)
346.00
42.59
Operating costs
Advertising
6.26
22.08
Utilities
573.25
Light/power
213.03
Telephone
$ 150.52
Interest
1,088.18
2,854.85
736.02
Insurance
192.22
99.36
Taxes
Land
1,301.33
1,424.46
(23.55)
Management
Professional fees
145.00
Others
Mortgage costs
10.00
Supplies
64.79
4.01
1.00
Miscellaneous
9.91
Depreciation 1,749.83
3,144.93
247.33
Total expenses 5,805.35
8,441.94
1,111.32
Net loss ($3,191.02)
($7,071.94)
($1,111.32)
*260 256 On July 10, 1961, petitioner joined in filing a rezoning petition with the City Council of Saginaw, Michigan. The petition, initiated by Draper, requested that the zoning be changed from multi-family and professional office classification to a retailing and light wholesale classification for the block-wide corridor lying between N. Michigan Avenue and the railroad tracks and extending from Draper to the south to some point north which included petitioner's four houses. The petition was initiated by Draper in order to permit it to extend its automobile operations, which was done upon the subsequent approval of the reclassification. Petitioner's motives for acquiescing in the petition were twofold: first, he felt that the requested reclassification would not make his property less valuable, and secondly, the goodwill stemming from his acquiescence would enhance his chances of selling insurance to Draper. In January 1962, petitioner received a flyer through the mail from a Los Angeles firm indicating that his property might be valuable for a motel. In an attempt to independently verify such a possibility, petitioner discussed the matter with the construction foreman at a Holiday *261 Inn motel being built near petitioner's office. The foreman, who was employed by Allen Bros. and O'Hara (hereinafter Allen Bros.), a construction and promotional firm from Memphis, Tennessee, promised to have someone from his company contact petitioner to pursue the matter further. On a later date, the manager of the sales promotion department of Allen Bros. contacted petitioner and suggested that petitioner's property might be an ideal location for an office building. In April 1962, at the request and expense of Allen Bros., petitioner had a local engineering company make a survey of the four houses. During July 1962, petitioner released an article to a local newspaper suggesting the possible construction of an office building on his property. Also during July 1962, a realty company was designated by Allen Bros. to handle future leasing in the proposed building and Allen Bros. informed petitioner that his four houses should be removed as soon as possible. By a document dated January 25, 1963, Winthrop E. Dailey, Jr. (hereinafter Dailey), agreed to purchase a 50 percent interest in petitioner's four parcels of real estate for $66,250, provided certain conditions were met, the substance *262 of those conditions being as follows: 1. Petitioner, Dailey, and Allen Bros. were to be the organizers of a Michigan corporation to be called Saginaw Professional Building, Inc. (hereinafter the corporation). 2. The corporation's authorized capitalization was to be $100,000 represented by 100,000 shares of common stock having a $1 par value. Each share of common stock was to have one vote and equal dividend rights. 3. The paid-in capital was to be $10,200 represented by 10,200 shares, of which petitioner, Dailey, and Allen Bros. were to subscribe and pay for 3,400 shares each. 4. The corporate directors were to be petitioner, Dailey, and W. Harwell Allen. The resident agent was to be petitioner and the officers were to be as follows: President Vice president Secretary-treasurer Petitioner W. Harwell Allen Dailey 5. If any shareholder decided to sell, pledge, or otherwise dispose of his shares, the corporation had a 60-day right of first refusal. If the corporation failed to exercise its right, the other shareholders were to be given the right to purchase, on a prorata basis, provided, however, that if a shareholder resold, within 5 years of purchase, any shares *263 acquired in this matter, he was required to pay to the original shareholder any profit made on the resale. 6. The corporation was to purchase the four parcels from petitioner and Dailey for $112,500, of which petitioner and Dailey would each receive one-half. 7. The corporation was to obtain a firm commitment on a permanent loan from Connecticut General Life Insurance Company for $700,000. 8. The corporation was to enter into a contract with Allen Bros. for the construction of an office building at a cost not to exceed $625,000. 9. The corporation was to obtain a firm commitment from Michigan National Bank, Saginaw, Michigan, to provide interim financing in an amount not less than $700,000. The agreement further provided that if any of the foregoing conditions were not met within 90 days, either petitioner or Dailey could terminate the agreement by notice in writing. In early 1963, the corporation was formed with petitioner as president and one-third owner. On March 19, 1963, the corporation entered into a 257 contract with Allen Bros. for the construction of a professional office building at a cost of $625,000. By an agreement dated May 19, 1963, petitioner and Dailey *264 sold the four parcels of real estate to the corporation for $112,500. The office building was subsequently constructed and is presently operated by the corporation. Petitioner, on his 1961 Federal income tax return, allocated the purchase price of the four parcels of real estate to land and buildings as follows: [7]
Percent
Percent
of
of
Land
total
Buildings
total
1600 N. Michigan Ave
$4,500
28
$11,562.25
72
1606 N. Michigan Ave
4,500
32
9,562.25
68
1612 N. Michigan Ave
4,500
28
11,613.87
72
1618 N. Michigan Ave
3,375
22
11,648.88
78
The 1961 valuation of the land and buildings for assessment purposes, according *265 to the official records of the City of Saginaw, Michigan, were as follows: Percent
Percent
of
of
Land
total
Buildings
total
1630 N. Michigan Ave
$2,300
45
$2,800
55
1606 N. Michigan Ave
2,300
38
3,700
62
1612 N. Michigan Ave
2,300
47
2,550
53
1618 N. Michigan Ave
1,700
21
6,500
79 The foregoing assessments were reviewed by the City Assessor's office at the time of purchase by petitioner and every year thereafter and were determined to be correct. The assessed value of the land at 1600 through 1618 was not increased despite the rezoning from residential to light commercial and despite the construction of the Saginaw Professional Building. On his Federal income tax return for 1963, petitioner claimed an ordinary loss for the demolition of the structures on 1600 and 1606 as follows: Cost
Depreciation
Claimed loss
1600
$11,562.25
$1,314.52
$10,247.73
1606
9,562.25
1,166.30
8,395.95 By timely refund claims filed for the years 1962 and 1963, petitioner claimed an ordinary loss on the sale of the house at 1612 and the demolition of the house at 1618, as follows: Sales
Claimed
Cost
Depreciation
price
loss
1612
$11,613.87
$820.50
$800
$9,993.37
1618
5,824.44
724.69
[8] 5,099.75
*266 Respondent, in his notice of deficiency, determined that petitioner was not entitled to deduct any ordinary losses for the years 1962 and 1963 with respect to the removal or demolition of the houses situated at 1600 through 1618. Opinion During 1961, petitioner purchased four houses, of which three were removed in 1962 and the fourth in 1963. Respondent's disallowance of petitioner's claimed loss deductions arising from the removal of the houses was based upon two grounds: first, that petitioner purchased the houses with the intent to demolish them, and secondly, that even if petitioner did not purchase them with such an intent, he has failed to establish the adjusted bases of those houses as of the time of demolition and removal. 258 Petitioner, of course, contends that he purchased the houses as income-producing investments without any intention to demolish and that the adjusted bases of the houses at the time of their demolition and removal were accurately reflected on his *267 books and records. As to the issue regarding petitioner's intent, it is now well established that where a taxpayer purchases real property improved by a building and at the time of purchase harbors the intention of demolishing the building, he is not entitled to a loss deduction under section 165 upon the eventual demolition of the building, but must allocate the adjusted basis of the building to the underlying land. Hillside National Bank, 35 T.C. 879 (1961); Lynchburg National Bank & Trust Co., 20 T.C. 670 (1953), affd. 208 F. 2d 757 (C.A. 4, 1953); N.W. Ayer & Son, Inc., 17 T.C. 631 (1951); Providence Journal Co. v. Broderick, 104 F. 2d 614 (C.A. 1, 1939). In the Lynchburg case, we stated the following at pages 673-674: Where, as here, there is a purchase of land with the intent to demolish a building situated thereon and erect a new one, no part of the price paid is allocable to the building, since it is deemed that the building has no value to the purchaser and it is the land which is purchased and which alone has value. The entire purchase price, therefore, represents the cost of the land and becomes the purchaser's *268 basis. N.W. Ayer & Son, Inc., 17 T.C. 631. The fact that a certain value was placed on the building at the time of purchase, that the buildings were rented and rent collected, and depreciation claimed is deemed immaterial. The original intention is the determining factor. Providence Journal Co. v. Broderick, 104 F. 2d 614. Therefore, the old building had a basis of zero to the petitioner. * * * Petitioner's intention at the time he purchased the four houses is a factual question, requiring not only a consideration of all relevant facts and circumstances, but the reasonable inferences to be drawn from them. As is usual in cases of this type, there are a number of facts in favor of as well as adverse to petitioner's position. However, after carefully reviewing all the relevant facts, we think a preponderance of the evidence supports petitioner's position. Since both parties have relied on a number of the criteria enumerated in respondent's regulations, section 1.165-3(c), Income Tax Regs., [9] we shall rely on those criteria where they apply to the facts herein. *269 We have found that petitioner's principal motive for acquiring the houses was to establish a source of income for the future education of his children. With no significant 259 prior experience in commercial real estate and only a relatively small cash outlay, petitioner went heavily into debt in order to begin his real estate investment program. At the time he purchased the houses, three were fully rented and the fourth, although vacant, was the best preserved of the group and appeared to offer even more income potential than the others. While it is true, as respondent so strenuously contends, that as the houses became vacant they were never rerented, it is equally true that nothing in the record suggests that such a situation was in any way brought on by petitioner's conduct. To the contrary, the record discloses that petitioner purchased furniture, drapes, curtains, bedspreads, and similar household items in an effort to make the houses as inviting as possible. With the help of his wife and children, he personally supervised the interior and exterior cleaning of the houses, hired mechanics to do the necessary maintenance and remodeling, spent over $300 for tree service alone, *270 and generally did whatever he felt was necessary to make the houses presentable. While we do not question the fact that petitioner wanted the houses to look their best when he went to the bank for refinancing, we think respondent places undue strain upon the facts when he contends that petitioner fixed the houses up solely or principally for the purpose of obtaining bank financing. The fact that petitioner purchased house accessories from departing tenants as well as placed a 5-year casualty policy on each dwelling soon after its purchase argues strongly against respondent's position. In addition, the record reflects a continuing effort by petitioner to rent the vacant houses, not only through newspaper advertisements, but also through personal solicitation of fellow employees and acquaintances. In addition, petitioner took the initiative on two separate occasions to reply to newspaper ads indicating an interest in houses to rent. Only after petitioner's numerous efforts to rent the vacant houses had failed did he finally come to realize that the financial burden of maintaining the houses as rental property was too great. Thus, on the advice of a real estate agent, petitioner finally *271 contracted for the demolition and removal of the houses in order to drastically reduce the cost of taxes and maintenance on the properties. Respondent contends that because petitioner eventually sold one-half of the underlying land to Dailey and they in turn sold the land to a corporation, of which they each owned one-third, for the purpose of constructing an office building, that course of conduct compels the conclusion that petitioner purchased the houses with the intent to demolish them and sell the underlying land. We think not. The evidence shows that the last of the four houses was purchased on August 15, 1961, whereas petitioner did not become interested in the possibility of commercially developing the land until he received a flyer in the mail in January 1962 indicating that his property might be valuable for a motel. However, it was not until at least several months later that petitioner seriously discussed with Allen Bros., who was to become the other one-third owner of the corporation, the possibility of constructing an office building on his land, and it was not until the spring of 1963 that petitioner and Dailey sold the land to the corporation for the purpose of erecting *272 the office building. We think the length of time between petitioner's purchase of the houses and the formulation of his plans to have an office building constructed is too great to support respondent's theory. Respondent attempts to bolster his argument by apparently contending that even if the eventual construction of the office building does not compel the conclusion that petitioner purchased the houses with the intent to demolish them, the fact that petitioner joined in the filing of a petition for rezoning does so. Petitioner acquired 1600 and 1606 in May 1961 and exercised his option to purchase 1612 and 1618 in August 1961. Since the petition for rezoning was filed on July 10, 1961, it is possible that even at the time petitioner purchased 1600 and 1606, he was aware that such a petition was to be filed and the possible effect it could have on the land on which the four houses stood. Conceding the possibility that petitioner was aware of the rezoning petition when he purchased the houses, we fail to see how that fact alone would necessitate a holding that he purchased with the intention to demolish. Petitioner's testimony convinces us that he believed that by supporting the *273 petition he would improve his chances of selling insurance to the chief proponent of the petition, Draper. Of more significance, however, is the fact that the land on which the four houses were situated was already zoned under a multi-family and professional office classification. Inasmuch as the building ultimately constructed on the four lots was a professional office building, there would seem to be no compelling reason for petitioner to urge a change in 260 zoning except for the reason stated, to develop goodwill in his insurance business. While we do not discard the possibility that petitioner supported the petition in the hope that if granted, his land would become more valuable, we cannot agree that petitioner's action compels the conclusion for which respondent contends. In this regard, the evidence indicates that although the City of Saginaw reviews land assessments annually, neither the granting of the rezoning petition nor the completion of the office building caused the assessor's office to increase the assessed value of petitioner's holdings. Of the criteria listed in respondent's regulations which are suggestive of an intent to demonish as of the time of acquisition, *274 sec. 1.165-3(c)(2), Income Tax Regs., we think none fit the facts in the instant case. The delay between the date of acquisition and the date of demolition was not short, ranging from approximately 7 to 8 months with respect to 1612 and 1618, to almost a year and a half with respect to 1600 and 1606. There is no evidence of prohibitive remodeling costs determined at the time of acquisition. To the contrary, the record reflects remodeling expenditures by petitioner in excess of $1,300, of which over $200 was spent after petitioner had obtained bank financing on all four houses. There was no municipal ordinance in existence at the time of acquisition which would have prohibited the continued use of the houses for profit purposes. At the time of acquisition, three of the four houses were fully rented and if petitioner had been able to rent 1618, which he considered to be the most desirable of the four properties, he would have been able to operate the properties at a profit. There was nothing in the condition of the houses which made them unsuitable as rental property, a conclusion specifically supported by the fact that three of the houses were occupied by tenants *275 at the time of purchase. Finally, we cannot say that as of the time of acquisition, petitioner was unable to realize a reasonable income from the buildings. The tenant in 1600 was paying $135 a month and the two families occupying 1606 paid a total monthly rental of $152.50 for a total gross rental of $3,450 a year. While the record fails to reflect the rental income on 1612 at the time of purchase, and although 1618 was vacant, we can conservatively estimate, considering the favorable evidence on the condition of 1618, that the annual rentals on 1612 and 1618 would have been at least equal to that derived from 1600 and 1606, giving petitioner a gross rental income from the four houses of $6,900 a year. For the full year 1962, when petitioner owned all four houses, his total expenses on the houses, less depreciation, was only $5,297.01. Thus had he received $6,900 of rental income before expenses, he would have generated approximately $1,600 a year on an original investment of approximately $5,000. While we recognize the weakness inherent in a projection of this kind, omitting as it does such things as vacancy rates and unusually large repairs, we think it serves the purpose of demonstrating *276 that it was reasonable for petitioner at the time of purchase, to expect to realize income from each of the four houses. Conversely, we think the facts in this case more clearly satisfy the criteria listed in section 1.165-3(c)(3), Income Tax Regs., suggesting that the demolition and removal of the houses occurred pursuant to a plan formed subsequent to acquisition. Thus, petitioner spent more than $1,300 to improve the houses immediately after acquisition and the houses were used for business purposes until it was no longer feasible to do so because of vacancies. The fact that there came a point in time when it was to petitioner's financial advantage to demolish the houses and use the land for an office building does not convince us that petitioner purchased the houses with the intent to demolish them. While we cannot disregard the fact that petitioner acquiesced in the petition for rezoning and ultimately became a one-third owner of the corporation which had an office building constructed on his former property, we do not think that these events, considered in the context of all the other evidence presented, permits us to find that petitioner acquired *277 the four houses with the intent to demolish or otherwise remove them. Respondent contends, however, that even if petitioner did not acquire the houses with the intent to demolish them, he is not entitled to a loss deduction since he has not established the correct amount of the loss. Specifically, respondent argues that the purchase agreements on the four houses failed to allocate between the cost of land and buildings and further, that petitioner has failed to introduce any testimony on this point. While it is true that the purchase agreements did not allocate cost between land and buildings, it is not true that the record is devoid of evidence on this point. 261 Petitioner's accountant, who was familiar with such allocation problems, was personally aware of land values in the same area where petitioner's houses were located and relied on that knowledge to allocate the purchase price on petitioner's properties. While we do not consider the accountant's knowledge of real estate values, at least as reflected by his testimony, to be sufficient to make him an expert, neither do we think petitioner should be denied his entire claimed loss deduction on the ground that he has failed *278 to prove the correctness of the allocation used. In the absence of any other evidence to guide us, we think petitioner's loss deduction must be arrived at by using the following allocation percentages: Percent of
Percent of
purchase price
purchase price
Address
to building
to land
1600
63.5
36.5
1606
65.0
35.0
1612
62.5
37.5
1618
78.5
21.5
Accordingly, we hold that petitioner is entitled to a loss deduction on the demolition and removal of the four houses in an amount to be determined by applying the above allocation percentages. Decision will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954.↩
2. The four houses were all on the same side of N. Michigan Avenue and were adjacent. ↩
3. The purchase price paid by petitioner for 1618 was to include the mirrors, carpeting, drapes, and blinds, as well as the beds, springs, and mattresses in all the bedrooms. At the time petitioner exercised the option on 1618, it was further understood that he would be permitted to purchase some of the kitchen appliances. After petitioner acquired 1618, his wife purchased bedspreads for the beds.↩
4. The record also indicates that in order to satisfy the demands of a tenant in one of the houses, petitioner had a washer and dryer electrical outlet installed at a cost of approximately $70.↩
5. When the tenants in 1606 vacated, petitioner purchased their curtains and drapes for $50 in order to keep the house presentable for prospective tenants. ↩
6. Petitioner had also advertised for the rental of 1618 immediately after its acquisition in October 1961.↩
7. The allocation between land and buildings for petitioner's four properties was established with the assistance of petitioner's accountant, a certified public accountant. Although the accountant was not a licensed real estate appraiser, he was personally familiar with the value of land in the same neighborhood and of the same character as that on which petitioner's houses stood. In addition, he was familiar with the allocation problems generally, as a result of property owned by him and his clients.↩
8. The loss claimed by petitioner on 1618 was for one-half of the alleged loss on that property inasmuch as petitioner sold a 50-percent interest in 1618 to Dailey prior to the time of demolition.↩
9. Sec. 165-3(c) Evidence of intention. (1) Whether real property has been purchased with the intention of demolishing the buildings thereon or whether the demolition of the buildings occurs as a result of a plan formed subsequent to their acquisition is a question of fact, and the answer depends upon an examination of all the surrounding facts and circumstances. The answer to the question does not depend solely upon the statements of the taxpayer at the time he acquired the property or demolished the buildings, but such statements, if made, are relevant and will be considered. Certain other relevant facts and circumstances that exist in some cases and the inferences that might reasonably be drawn from them are described in subparagraphs (2) and (3) of this paragraph. The question as to the taxpayer's intention is not answered by any inference that is drawn from any one fact or circumstance but can be answered only by a consideration of all relevant facts and circumstances and the reasonable inferences to be drawn therefrom. (2) An intention at the time of acquisition to demolish may be suggested by: (i) A short delay between the date of acquisition and the date of demolition; (ii) Evidence of prohibitive remodeling costs determined at the time of acquisition; (iii) Existence of municipal regulations at the time of acquisition which would prohibit the continued use of the buildings for profit purposes; (iv) Unsuitability of the buildings for the taxpayer's trade or business at the time of acquisition; or (v) Inability at the time of acquisition to realize a reasonable income from the buildings. (3) The fact that the demolition occurred pursuant to a plan formed subsequent to the acquisition of the property may be suggested by: (i) Substantial improvement of the buildings immediately after their acquisition; (ii) Prolonged use of the buildings for business purposes after their acquisition; (iii) Suitability of the buildings for investment purposes at the time of acquisition; (iv) Substantial change in economic or business conditions after the date of acquisition; (v) Loss of useful value occurring after the date of acquisition; (vi) Substantial damage to the buildings occurring after their acquisition; (vii) Discovery of latent structural defects in the buildings after their acquisition; (viii) Decline in the taxpayer's business after the date of acquisition; (ix) Condemnation of the property by municipal authorities after the date of acquisition; or (x) Inability after acquisition to obtain building material necessary for the improvement of the property.↩